******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# STATE OF CONNECTICUT *v.* ALANNA R. CAREY
## (AC 40868)

Alvord, Sheldon and Eveleigh, Js.

*Syllabus*

Convicted, following a jury trial, of the crime of murder in connection with the shooting death of her former boyfriend, the defendant appealed. On appeal, she claimed, inter alia, that the trial court erred in admitting the testimony of M, a friend of the victim, to explain the victim's fear of the defendant and to rebut the defendant's claim of self-defense. Specifically, the defendant claimed that M's testimony was inadmissible hearsay and that she was prejudiced by the admission of the statements. *Held*:

1. The defendant's claim that the trial court erred in admitting the testimony of M was unavailing; even if the trial court erred in admitting M's testimony under the state of mind or residual exceptions to the hearsay rule, any error was harmless in light of the overwhelming evidence of the defendant's consciousness of guilt, as the defendant, after shooting the victim in a motel room, contacted C, her sister, instead of calling 911, the defendant subsequently left the motel with C and ignored her family members' repeated entreaties that she return to the scene of the shooting and call 911, the defendant returned to the motel only after being physically pushed out of C's car, the defendant finally called 911 after approximately three hours had passed from the time of the shooting, and she misled the 911 operator when she reported the shooting.

2. The defendant could not prevail on her claim that the state engaged in prosecutorial impropriety that deprived her of a fair trial when, during direct examination of the defendant, the prosecutor stated that defense counsel was cheating, as there was no ascertainable evidence in the record that the state engaged in prosecutorial impropriety during the defendant's direct examination; there was no evidence that the prosecutor's comment was considered by the jury, as the prosecutor's comment was not addressed to the jury and although while defense counsel speculated that the jury might have heard the prosecutor, there was no evidence that anyone, other than defense counsel, heard the comment.

3. The defendant's claim that he was deprived of a fair trial as a result of prosecutorial improprieties during closing argument was unavailing: the prosecutor did not improperly impugned the credibility of defense counsel, as the prosecutor's challenged comment responded directly to the statements of defense counsel regarding the credibility of a witness and properly stated that counsel's opinion was not evidence that could be considered by the jury, the prosecutor did not direct the jury to disregard the trial court's charge as to the affirmative defense of extreme emotional disturbance, the transcript having reflected that the prosecutor merely pointed out that there was not a factual basis for the jury to find that the defendant proved that affirmative defense, and the prosecutor did not improperly argue facts not in evidence when he said that a witness impermissibly spoke with the defendant during trial and that the defendant did not take her car to the motel because she was trying to avoid being caught on surveillance cameras, or improperly express his personal opinion regarding the defendant's credibility when he stated that the defendant's credibility was nonexistent, as the challenged comments asked the jury to draw reasonable inferences from facts that were properly in evidence and the reasonable inferences to be drawn from them.

4. The trial court did not abuse its discretion by giving the jury a falsus in uno instruction, which instructed the jury that if it concluded that a witness had deliberately testified falsely in some respect, it should carefully consider whether to rely on any of that person's testimony, as the instruction was within the court's discretion and the defendant had failed to show that it misled the jury; the falsus in uno instruction provided by the court correctly stated the law and merely advised the members of the jury as to their task of weighing witness credibility, and although the defendant relied on decisions from other jurisdictions

that advise against the use of falsus in uno instructions, those cases are merely potentially persuasive authority, our appellate courts have recognized the maxim falsus in uno, falsus in omnibus as a permissive instruction, and the defendant did not demonstrate how the instruction misled the jury.

Argued October 18, 2018—officially released January 29, 2019

*Procedural History*

Substitute information charging the defendant with the crime of murder, brought to the Superior Court in the judicial district of New Britain, where the court, *Keegan, J.*, denied in part the defendant's motion to preclude certain evidence; thereafter, the matter was tried to the jury before *Keegan, J.*; subsequently, the court denied the defendant's motion for a mistrial; verdict and judgment of guilty; thereafter, the court denied the defendant's motion for a judgment of acquittal and the defendant's amended motion for a new trial, and the defendant appealed. *Affirmed.*

*Jennifer B. Smith*, for the appellant (defendant).

*Rocco A. Chiarenza*, assistant state's attorney, with whom, on the brief, were *Brian Preleski*, state's attorney, *John H. Malone*, former supervisory assistant state's attorney, and *David Clifton*, assistant state's attorney, for the appellee (state).

*Opinion*

EVELEIGH, J. The defendant, Alanna R. Carey, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a (a).[1] On appeal, the defendant claims that (1) the trial court improperly admitted hearsay testimony, (2) the state engaged in prosecutorial impropriety that deprived her of a fair trial, and (3) the trial court's instruction on witness credibility improperly misled the jury. We disagree and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The defendant and the victim, Edward Landry, began dating in May, 1999. Between 1999 and the victim's death in January, 2012, the defendant and the victim had a tumultuous relationship. In 2008, the victim moved into the defendant's house in Glastonbury, where the two lived together until 2011. Many of those acquainted with the defendant and the victim, including their relatives and neighbors, described their relationship as volatile and testified that the two often argued and fought.

On December 12, 2011, the defendant's twin sister, Johanna Carey-Lang, learned that the victim was having an affair with Jodi D'Onofrio when she walked into the defendant's home and found the victim and D'Onofrio together. That same day, the victim called the defendant and informed her of his infidelity. Nevertheless, later in the day, Carey-Lang saw the defendant and the victim "cuddling" on a couch in the defendant's house.

On December 14, 2011, the victim moved out of the defendant's house and moved to the Carrier Motor Lodge in Newington (motel). On that day, the victim removed his belongings from the defendant's house and left his keys in the house, which, according to D'Onofrio, was an attempt by the victim to communicate to the defendant that their relationship was over. D'Onofrio also testified that the victim told her that he did not want to be in a relationship with the defendant any longer and that he hoped the breakup would be amicable.

After the victim moved to the motel, he and the defendant remained in contact. Between December 15, 2011 and January 2, 2012, the two exchanged over ninety-five phone calls and twenty-five text messages. Additionally, the defendant and the victim saw each other in person several times during that period.

On December 18, 2011, the defendant checked into the motel and rented a room close to the victim's. The defendant called Carey-Lang from the motel room and asked her to set up a three way phone call with the victim. D'Onofrio was with the victim when he received the defendant's call. According to D'Onofrio, the defendant asked the victim whether he still loved her, to

which the victim responded that he loved D'Onofrio. The victim subsequently informed his friend, Jessica Montano, of his interaction with the defendant on December 18, 2011. According to Montano, the victim recounted that the defendant begged him not to end their relationship and that, as a result of this interaction, the victim feared the defendant.

On January 2, 2012, the defendant and Carey-Lang went to the shooting range at Hoffman's Gun Center (gun center) in Newington. Leon Brazalovich, Carey-Lang's boyfriend, accompanied the sisters to the gun center, but did not shoot while he was there. The defendant and Carey-Lang, both of whom had gun permits, signed in at the front desk and proceeded to shoot at the range for approximately thirty minutes to an hour. The defendant used her gun, a pink .380 Ruger light pistol, to shoot. After the defendant and Carey-Lang left the range, the defendant asked Brazalovich to load ammunition she had just purchased at the gun center into two magazines.

At 1:33 p.m., while the defendant was at the shooting range, she received a call from the victim. After speaking to the victim, the defendant told Carey-Lang that she planned to bring him lunch at the motel. At around 2 p.m., the defendant drove Carey-Lang and Brazalovich to Boston Market, where the defendant ordered lunch. The defendant then drove to the motel, where she got out of the car and went to the victim's room, carrying the food and her purse, which contained her gun.

About forty-five minutes after the defendant arrived at the motel, Carey-Lang sent the defendant a text message, informing her that she and Brazalovich had finished lunch. The defendant responded that she would like to spend another hour at the motel, and Carey-Lang told her to call when she was ready to be picked up.

Three hours later, at approximately 4:20 p.m., the defendant sent Carey-Lang a text message, asking: "When will you be here." Approximately one minute later, the defendant again texted Carey-Lang, asking: "When can you pick me up? After dance?" Between 5:35 and 6:51 p.m., the following text message exchange took place:

"[The Defendant]: How long before you get here

"[Carey-Lang]: I [don't] know. Why

"[The Defendant]: Because he is yelling and threatening me.

"[Carey-Lang]: Why

"[The Defendant]: He hate[s] me

"[Carey-Lang]: What happened

"[The Defendant]: How long before you get here

"[Carey-Lang]: [I'm] at [Dani's] g class. [Can't] leave

"[Carey-Lang]: I [don't] know

"[The Defendant]: How long?

"[The Defendant]: ???

"[The Defendant]: Hello. . . .

"[Carey-Lang]: Just leaving

"[The Defendant]: How long"

Between 7:02 and 7:04 p.m., Carey-Lang sent the defendant text messages instructing the defendant to meet her at an Aldi market near the motel in five minutes. Approximately eight minutes later, Carey-Lang sent the defendant a text message stating that she was at Aldi. About eighteen minutes after that, at approximately 7:30 p.m., the defendant called Carey-Lang and asked her to come to the victim's room. Sometime during the period in which the defendant and Carey-Lang discussed meeting at Aldi, the defendant shot and killed the victim.

When Carey-Lang arrived at the motel, the defendant invited her into the room and informed her that "[the victim] came after [the defendant] with a knife, and that he put a hit on [their] family, and he was going to take care of [the defendant] himself." The victim's body was on the floor when Carey-Lang entered the room, but she did not recall seeing a knife near the victim. She checked the victim's pulse and could not detect one. Carey-Lang then instructed the defendant to call 911, but the defendant refused to do so.

At approximately 8 p.m., the defendant and Carey-Lang left the motel room. The defendant took the shell casings, which she placed in her pocket, with her purse, her cell phone, and the bag of food from Boston Market. The two drove from the motel directly to the home of their brother, Joseph Carey, in Wethersfield.

During the drive to Wethersfield, Carey-Lang continued to encourage the defendant to call 911. Once they arrived in Wethersfield, Carey-Lang and Joseph Carey urged the defendant to return to the motel and call 911.

Eventually, the defendant agreed, and Carey-Lang drove her back to the motel. Once they reached the motel, however, the defendant changed her mind and refused to go back into the victim's room. Carey-Lang drove to a nearby parking lot and called Joseph Carey to ask if he would join them. When Joseph Carey arrived at the parking lot, Carey-Lang called their father, who also encouraged the defendant to call 911. After Joseph Carey spoke with the defendant, Carey-Lang drove the defendant back to the motel, where she "sort of tried to push [the defendant] out of the car" and drove away.

After being dropped off at the motel, the defendant returned to the victim's room, where she called Carey-Lang three more times, once at 9:35 p.m. and twice at

9:50 p.m. During the second 9:50 p.m. call, the defendant asked Carey-Lang to come back to the motel and pick her up, but Carey-Lang refused to do so.

Finally, at approximately 10 p.m., almost three hours after the defendant shot the victim, the defendant called 911. The defendant told the 911 operator: "My boyfriend and I were, you know, just talking and all of a sudden he got real angry, he came at me with a knife, and I was scared. I shot him." The operator asked whether the victim was moving, and the defendant responded, "I don't think so." The defendant also told the operator that she "didn't even know if [she] hit him" and, when asked whether she was injured, the defendant said: "I don't know. I don't think so."

The police arrived at the motel at approximately 10:13 p.m. and instructed the defendant to exit the victim's room. Once the defendant had exited the room, the police placed her in the back of a police vehicle. The police then entered the room, where they found the victim's body on the floor between two beds. Matthew D'Esposito, an officer with the Newington Police Department, "noticed that [the victim] was not breathing, [and that] he had no carotid pulse." D'Esposito testified that "[t]here was some slight rigor mortis in [the victim's] pinky fingers . . . ." After efforts to resuscitate the victim at the scene failed, he was transported to Hartford Hospital, where he was pronounced dead on arrival.

When the police searched the room, they found, on the floor, the defendant's gun and three shell casings that were subsequently determined to have been fired from that gun. They also found the defendant's purse, which contained a gun holster and case, as well as a magazine containing six .380 caliber bullets. The defendant's purse also contained a pair of latex gloves. The defendant's DNA was found on the exterior of the gloves.

After the defendant was placed in the back of the police vehicle, she was transported to the Hospital of Central Connecticut (hospital), in New Britain, because she was verbally unresponsive. When the defendant arrived at the hospital around 10:45 p.m., she was still unresponsive. From 12:30 a.m. to 7:30 a.m., on January 3, 2012, the defendant failed to respond to painful stimuli. Finally, around 7:30 a.m., she was revived by a sternal rub. Hamid Ehsani, an emergency physician at the hospital, diagnosed the defendant with conversion disorder, which is "a change in the neurologic status of a patient which cannot be explained easily by any obvious medical condition." Ehsani was unable to rule out a diagnosis of malingering, which, in Ehsani's words, "is when one acts in a certain way . . . to suit [his or her] purposes at the time." At approximately 8 a.m., on January 3, 2012, the defendant was discharged into police custody.

The jurors heard evidence from various witnesses at trial. Jason Daniel Elkins, who was in the room next to the victim's on the night of the shooting, testified that he heard three gunshots between 7:16 and 7:38 p.m., but that he did not hear any noises from the room prior to the gunshots.

Ira Kanfer, a medical examiner employed by the Office of the Chief Medical Examiner for the state of Connecticut, testified that the victim had been shot three times—once in his left shoulder, once in his lower left abdomen and once in the left side of his chest. Three bullets matching the caliber of the defendant's gun were found inside the victim's body. Kanfer estimated that the victim's death was instantaneous or would have occurred within thirty to forty-five seconds of the time of the shooting.

John Brunetti, a fingerprint examiner employed by the state forensic lab, testified that he was unable to find latent fingerprints on any of the six knives belonging to the victim that were found inside the victim's room. Fung Kwok, a forensic examiner employed by the state forensic lab, testified that gunshot residue was found on both the defendant's and the victim's hands.[2]

This appeal followed. Additional facts and procedural history will be set forth as necessary.

## I

The defendant first argues that the trial court erred in admitting the testimony of Mark Manganello, a friend of the victim, to explain the victim's fear of the defendant and to rebut the defendant's claim of self-defense. Specifically, the defendant argues that Manganello's testimony was inadmissible hearsay and that she was prejudiced by the admission of the statements. The state argues that the court did not abuse its discretion in admitting Manganello's testimony under the residual hearsay exception. The state further argues that, even if the trial court erred in admitting Manganello's testimony, the error was harmless. We agree with the state that, even if the trial court erred in admitting Manganello's testimony, any such error was harmless.[3]

The following additional facts and procedural history are relevant to the resolution of this claim. Before trial, the defendant filed a motion in limine to preclude Manganello from testifying about conversations he had had with the victim. The defendant argued that the statements were double hearsay and that, even if the defendant's statements to the victim fell within the state of mind exception to the hearsay rule, the second layer of hearsay—the victim's statements to Manganello—did not fall within any recognized hearsay exception. The state objected to the defendant's motion, arguing that the statements were admissible under the state of mind exception to show that the victim feared the defendant.

The court denied the defendant's motion, stating: "The state is offering this evidence as to a prior bad act of the defendant, and [it is] claiming that it is relevant with respect to intent and motive. Testimony of the victim's fear of the defendant is relevant, especially in a case where there is a homicide that involves . . . a domestic situation where there's evidence of a deteriorating relationship. It's also relevant to intent and motive and to rebut a defendant's self-defense claim. Again, this evidence will be subject to a limiting instruction to the jury that [it is] not to consider the evidence as establishing a predisposition on the part of the defendant to commit the crime charged or to demonstrate a criminal propensity but, rather, that it bears on the issue of the defendant's intent and motive in the case."

At trial, Manganello testified that the victim told him that he went to the defendant's house on December 24, 2011, to retrieve some belongings. The victim told Manganello that he thought the defendant was not at home, and that he entered the house by crawling through a window. Once he got inside, the victim encountered the defendant, who pointed a gun at him and told him that if he ever returned "she would blow his f'ing brains out."

We begin by briefly setting forth the relevant standard of review and legal principles for this claim. "To the extent a trial court's admission of evidence is based on an interpretation of the Code of Evidence, our standard of review is plenary. . . . We review the trial court's decision to admit evidence, if premised on a correct view of the law, however, for an abuse of discretion." (Citations omitted.) *State* v. *Saucier*, 283 Conn. 207, 218, 926 A.2d 633 (2007).

"[W]hen an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [W]hether [the improper admission of a witness' testimony] is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the [improperly admitted] evidence on the trier of fact and the result of the trial. . . . [T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error. . . . Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *LeBlanc*, 148 Conn. App. 503, 508–509, 84

A.3d 1242, cert. denied, 311 Conn. 945, 90 A.3d 975 (2014).

In the present case, even if we assume, without deciding, that the trial court erred in admitting Manganello's testimony under the state of mind or residual hearsay exceptions, any error was harmless in light of the overwhelming evidence of the defendant's consciousness of guilt. After shooting the victim sometime between 7:16 and 7:38 p.m., the defendant did not call 911. Instead, the defendant called and texted Carey-Lang, asking her to come to the motel. When Carey-Lang came to the room, she encouraged the defendant to call 911, but the defendant refused. Ultimately, the defendant retrieved the shell casings off of the floor and gathered her belongings, including her cell phone, her purse, and the bag of food she had brought, and left the motel with Carey-Lang. After leaving the motel, the defendant continued to refuse to call 911, despite being urged to do so by her brother and her father.

The defendant also ignored her family members' entreaties that she return to the scene of the shooting. In fact, the defendant returned to the motel only after being physically pushed out of Carey-Lang's car. Even after the defendant returned to the motel room, she called Carey-Lang and begged her to return to the motel and pick her up. Then, before the defendant finally called 911 at approximately 10:20 p.m., she staged the scene, putting the shell casings she had earlier picked up back on the floor.

Moreover, the defendant misled the 911 operator when she reported the shooting. Almost three hours had elapsed since the shooting, but the defendant suggested that the shooting had just occurred. Additionally, even though the defendant knew that the victim had died hours earlier, she told the operator: "I don't *think* [he's moving]." (Emphasis added.) In response to the operator's inquiry as to where the victim had been shot, the defendant said: "I didn't even know if I hit him." On the basis of the foregoing, we conclude that any error in the admission of Manganello's testimony did not substantially affect the verdict and, therefore, was harmless.

II

The defendant next argues that the state engaged in prosecutorial impropriety that deprived her of a fair trial.[4] Specifically, the defendant claims that the state engaged in prosecutorial impropriety when the prosecutor made certain comments during (1) the defendant's direct examination and (2) the prosecutor's closing argument. In response, the state argues that the prosecutor's comments were not improper and contends that, even if they were, they did not deprive the defendant of a fair trial. We conclude that there is no evidence in the record that the state engaged in prosecutorial impro-

priety.[5]

We begin by setting forth the applicable standard of review and legal principles for claims of prosecutorial impropriety. "In analyzing claims of prosecutorial [impropriety], [the reviewing court] engage[s] in a two step analytical process. The two steps are separate and distinct: (1) whether [an impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of [her] due process right to a fair trial." (Internal quotation marks omitted.) *State* v. *Warholic*, 278 Conn. 354, 361, 897 A.2d 569 (2006). "[W]hen a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the burden is on the defendant to show, not only that the remarks were improper, but also that, considered in light of the whole trial, the improprieties were so egregious that they amounted to a denial of due process. . . . On the other hand . . . if the defendant raises a claim that the prosecutorial improprieties infringed a specifically enumerated constitutional right, such as the fifth amendment right to remain silent or the sixth amendment right to confront one's accusers, and the defendant meets his burden of establishing the constitutional violation, the burden is then on the state to prove that the impropriety was harmless beyond a reasonable doubt." (Citation omitted.) *State* v. *Payne*, 303 Conn. 538, 562–63, 34 A.3d 370 (2012).

A

First, the defendant argues that the state engaged in prosecutorial impropriety when, during direct examination of the defendant, the prosecutor stated that defense counsel was "cheating." The defendant argues that this comment impugned the credibility and trustworthiness of defense counsel and, therefore, was impermissible. We disagree.

The following additional facts are relevant to this claim. During the defendant's direct examination, the following exchange occurred:

"[Defense Counsel]: Now, do you know how many calls you received from December 14, [2011], from [the victim] up until the point of January 2, [2012]? Do you know the exact number?

"[The Defendant]: That I do not know.

"[Defense Counsel]: Can you put that up, [clerk]? Thank you, [clerk]. Okay, and can we—all right, we'll come back to that in a moment. No problem, [clerk].

"[Defense Counsel]: [W]ould it refresh your recollection to look at the document to refresh you on the number of calls [the victim] made to you and the number that you made to him during the timeframe of December 14, 2011, to January 2, [2012], would that refresh your memory to look at something?

"[The Defendant]: I'm not sure.

"[Defense Counsel]: Your Honor, the prosecutor just said—

"The Court: Let me just say, what is the question here because I did just hear your client say she's not sure she can—

"[Defense Counsel]: The prosecutor said in front of the jury [that] what I did was cheating just now. I don't know who heard it, and I'm concerned because I'm not cheating."

The court then instructed the jury not to consider the prosecutor's comment.

At the end of the state's rebuttal argument, the defendant moved for a mistrial based on this comment and several additional alleged improprieties committed by the prosecution during closing argument.[6] After hearing arguments on the motion, the court denied the defendant's motion, concluding that "[the prosecutor's conduct did not] rise to the level of error or defect that results in a substantial or irreparable prejudice to the defendant's case."

We reject the defendant's claim because there is no evidence that the prosecutor's comment was considered by the jury. The present case is distinguishable from *State* v. *Payne*, supra, 303 Conn. 564–65, where the prosecutor told the jury: "[Y]ou've heard defense counsel tell you her client was honest. It's your decision and your duty to decide who is being honest. In fact, attorneys aren't even ethically allowed to say a particular witness is honest or not. That's for the jury . . . ." (Emphasis omitted; internal quotation marks omitted.) In the present case, the prosecutor's comment was not addressed to the jury, and while defense counsel speculated that the jury might have heard the prosecutor, there is no evidence that anyone, other than defense counsel, heard the comment. In fact, the court reporter did not record the comment. Indeed, the comment might not have been heard by any members of the jury had defense counsel not repeated it by stating, on the record, that the prosecutor had just accused him of cheating. Furthermore, instead of moving for a mistrial when the prosecutor made the comment at issue, the defendant proceeded with trial and did not move for a mistrial until the eve of jury deliberations. We conclude, therefore, that there is no ascertainable evidence in the record that the state engaged in prosecutorial impropriety during the defendant's direct examination. Accordingly, this claim fails.

B

The defendant also claims that the state committed prosecutorial improprieties during closing argument. Specifically, the defendant claims that the prosecutor improperly (1) impugned the integrity of defense coun-

sel, (2) directed jurors to ignore certain jury instructions, (3) argued facts not in evidence on two occasions, and (4) expressed his own opinion regarding the defendant's credibility. We disagree.

At the outset, we set forth the legal principles that guide our review of allegations of prosecutorial impropriety during closing argument. "[O]ur Supreme Court has acknowledged that prosecutorial impropriety of a constitutional magnitude can occur in the course of closing arguments. In determining whether such [impropriety] has occurred, the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . While a prosecutor may argue the state's case forcefully, such argument must be fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Consequently, the state must avoid arguments which are calculated to influence the passions or prejudices of the jury, or which would have the effect of diverting the jury's attention from [its] duty to decide the case on the evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *Gordon*, 104 Conn. App. 69, 74–75, 931 A.2d 939, cert. denied, 284 Conn. 937, 937 A.2d 695 (2007).

1

First, the defendant claims that the prosecutor improperly told the jury that defense counsel should not have offered his personal opinion about the credibility of a witness. The defendant argues that this comment improperly impugned the credibility of defense counsel. We disagree.

The following additional facts and procedural history are relevant to this claim. During closing argument, defense counsel stated the following with respect to D'Onofrio's testimony: "I don't think, in this trial, [D'Onofrio] was forthcoming on this whole thing where you can trust her . . . ." In response, the prosecutor said the following during closing argument: "Counsel [has] mentioned to you several times that he gave you his opinion, or at least I see it as his opinion, when he said he didn't think that [D'Onofrio] was credible, and he talked about other things that he thought [about] people manipulating people. . . . [O]ur opinion is not in evidence. It's the evidence that counts. I'm not giving you my opinion. . . . It's not proper. But [defense] counsel did it, and I suggest . . . that when you remember what he said, that you disregard it. It was just his opinion."

"Although . . . only the court has the authority to instruct the jury on the law . . . we recognize that in commenting on facts in evidence and the inferences to

be drawn from them, it is common practice for counsel to refer to the law." (Citation omitted.) *State* v. *Gordon*, supra, 104 Conn. App. 75. Additionally, "[w]hen a prosecutor's allegedly improper argument is in direct response to matters raised by defense counsel, the defendant has no grounds for complaint." (Internal quotation marks omitted.) *State* v. *Brown*, 256 Conn. 291, 309, 772 A.2d 1107, cert. denied, 534 U.S. 1068, 122 S. Ct. 670, 151 L. Ed. 2d 584 (2001); see, e.g., id. (concluding that prosecutor's comment that "[the defendant is] able to call [the firefighters] names" was not impermissible because it was in "direct response to the defendant's sarcasm toward one of the firefighters during his cross-examination and to the [fire] department as a whole during his closing argument" [internal quotation marks omitted]).

When the prosecutor commented on the statements made by defense counsel, he stated an established legal principle, namely, that counsel's opinion is not evidence that may be considered by the jury. See, e.g., *State* v. *Stevenson*, 269 Conn. 563, 583, 849 A.2d 626 (2004). The prosecutor's comment was permissible under this court's decision in *Gordon*. Additionally, defense counsel raised the matter when he opined on D'Onofrio's credibility. The prosecutor's comment in the present case, like that of the prosecutor in *Brown*, responded directly to the statements of defense counsel. We conclude, therefore, that the prosecutor's comment did not constitute prosecutorial impropriety.

2

Second, the defendant claims that the prosecutor improperly "directed the jury not to follow jury instructions." Specifically, the defendant argues that the prosecutor told the jury that it could dismiss an instruction regarding the affirmative defense of extreme emotional disturbance. We disagree.

The following additional facts and procedural history are relevant to this claim.

At the charging conference on September 29, 2015, the defendant requested an extreme emotional disturbance instruction. The state objected to the instruction, but, on September 30, 2015, the court ruled that it would give the instruction. The court gave the jury the extreme emotional disturbance instruction on October 1, 2015.[7]

During closing argument, the prosecutor told the jury: "I would point out also that when we talk about extreme emotional disturbance, [defense] counsel did not say a word about that. Perhaps he doesn't think it's in the case either. He never argued to you that [the defendant] was under extreme emotional disturbance when she fired the gun. . . . [H]e never even mentioned that in his argument, and I think that you . . . can dismiss that from the case. It is an instruction the judge told us that she would give you, but there's not a shred

of evidence, and even he doesn't apparently think it's worth much."

After closing argument, defense counsel argued to the court that the prosecutor told the jury to "dismiss the [extreme emotional disturbance] instruction." The prosecutor responded: "I never said that. I'm sure [defense counsel] misheard me . . . ."

"[I]t is the trial court's obligation to inform the jury what the law is as applicable to the facts of the case." *State* v. *Theriault*, 38 Conn. App. 815, 820, 663 A.2d 423, cert. denied, 235 Conn. 922, 666 A.2d 1188 (1995). Furthermore, "only the court has the authority to instruct the jury on the law . . . ." (Citation omitted.) *State* v. *Gordon*, supra, 104 Conn. App. 75. The parties and their counsel are responsible for presenting facts rather than law to the trier. See E. Prescott, Tait's Handbook of Connecticut Evidence (6th Ed. 2019) § 1.19.3 (a), p. 72.

The prosecutor did not suggest to the jury that it "dismiss" the court's instruction, as contended by defense counsel. Although defense counsel insisted that the prosecutor used the term "disregard" when discussing the extreme emotional disturbance instruction during closing argument, the use of this verb is not borne out by the record. The transcript reflects that the prosecutor merely pointed out that there was not a factual basis for the jury to find that the defendant proved the affirmative defense of extreme emotional disturbance. In so doing, the prosecutor did not tell the jury to disregard the court's charge; rather, he remarked on the lack of evidence available to the members of the jury in their consideration of the affirmative defense of extreme emotional disturbance instruction. On this basis, we conclude that the prosecutor did not improperly direct the jury to ignore the court's instructions with regard to the affirmative defense of extreme emotional disturbance.

3

Third, the defendant claims that the prosecutor improperly argued facts not in evidence twice during closing argument—once when he said that the defendant did not take her car to the motel because she was trying to avoid being caught on surveillance cameras, and again, when he said that Carey-Lang impermissibly spoke with the defendant during trial. The state argues that these comments supported reasonable inferences that the jury could have drawn from the evidence presented. We agree with the state.

The following additional facts and procedural history are relevant to this claim. At trial, the jury heard a tape recorded conversation between the defendant and Carey-Lang. In this conversation, the defendant asked Carey-Lang to send photographs of her home to her counsel, which Carey-Lang said she could not do

because there was a sequestration order in place. The court informed the jury that the recording was to be used for impeachment purposes only, not to show that Carey-Lang violated the sequestration order. During closing argument, the prosecutor said: "[The defendant] brings in her sister again, [Carey-Lang], who we already know has violated the court's order about not talking about the evidence when she talked to her sister about the case."

The jury also heard evidence that the motel where the victim was shot had been the site of criminal activity in the past. The defendant testified that she brought her gun with her to the motel because she believed it was in a dangerous area. During closing argument, the prosecutor said that the defendant did not drive her own car to the motel because "[s]he [could] reasonably expect there'd be video cameras" at the motel.

It is well established that "[c]ounsel may comment upon facts properly in evidence and upon reasonable inferences to be drawn from them. . . . Counsel may not, however, comment on or suggest an inference from facts not in evidence." (Internal quotation marks omitted.) *State* v. *Lopez*, 280 Conn. 779, 803, 911 A.2d 1099 (2007); see, e.g., id., 804 ("the prosecutor did not rely on a fact not in evidence when he drew the jury's attention to the fact that the testimony of the witnesses who could not specifically identify the defendant was not inconsistent with the testimony of the two witnesses who did identify him").

In the present case, the comments the prosecutor made during closing argument asked the jury to draw reasonable inferences from facts that were properly in evidence. When the prosecutor commented on Carey-Lang's violation of the sequestration order, the jury had already heard the recording of the phone call that supported that assertion. Similarly, the prosecutor's comment regarding surveillance cameras was based on inferences the jury could draw from evidence that the defendant believed that the motel was in a dangerous area. As the prosecutor pointed out, the defendant could "reasonably expect" that there were surveillance cameras at the motel because it was in an area where criminal activity might occur. Additionally, the prosecutor did not explicitly state that the motel had surveillance cameras. Rather, he said that the defendant could "reasonably expect" that the motel had them. We conclude, therefore, that the prosecutor did not improperly argue facts that were not in evidence.

4

Fourth, the defendant argues that the prosecutor impermissibly gave his personal opinion regarding her credibility during closing argument. We disagree.

The following additional facts and procedural history are relevant to this claim. During closing argument, the

prosecutor said the following to the jury: "I submit that the defendant's credibility is nonexistent. Her claim of self-defense is incredible and . . . the state has disproved it beyond a reasonable doubt." The prosecutor then discussed evidence from the defendant's testimony in support of the state's argument that the defendant was not a credible witness. When defense counsel moved for a mistrial, he argued that the prosecutor, during closing argument, had called the defendant a "liar" and accused her of "deliberately" lying.

"[A] prosecutor may not express his [or her] own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Put another way, the prosecutor's opinion carries with it the imprimatur of the [state] and may induce the jury to trust the [state's] judgment rather than its own view of the evidence. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions. . . . However, [i]t is not improper for the prosecutor to comment upon the evidence presented at trial and to argue the inferences that the jurors might draw therefrom . . . . We must give the jury the credit of being able to differentiate between argument on the evidence and attempts to persuade [it] to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand." (Citation omitted; internal quotation marks omitted.) *State* v. *Stevenson*, supra, 269 Conn. 583; see, e.g., id., 584 ("The assistant state's attorney's remark during closing argument describing the defendant's explanation as to how he obtained money to buy drugs as 'totally unbelievable' did not necessarily express her personal opinion. Rather, it was a comment on the evidence presented at trial, and it posited a reasonable inference that the jury itself could have drawn without access to the assistant state's attorney's personal knowledge of the case.").

The prosecutor's statement about the defendant's credibility was permissible because the prosecutor was commenting on facts properly in evidence and reasonable inferences to be drawn from them. Like the prosecutor's comment in *Stevenson*, the prosecutor's comments regarding the defendant's credibility in the present case were based on reasonable inferences that could be made based on the defendant's testimony and demeanor at trial. In fact, the prosecutor specifically cited evidence in support of his comments about the defendant's lack of credibility, including the defendant's testimony regarding text messages that she exchanged with the victim on December 31, 2011,[8] and "her story,

what she claims actually happened in [the victim's room]" prior to the shooting. Moreover, at the outset of closing argument, the prosecutor cautioned the jury to ignore any expressions of personal opinion he might make, stating: "I don't intend to offer you my personal opinion on this case. My personal opinion is completely irrelevant. So, if there's ever a point in my argument . . . that you feel I'm expressing a personal opinion, please disregard that. That is not my intention." Based on the foregoing, we conclude that the prosecutor did not improperly express his personal opinion as to the defendant's credibility.

III

Finally, the defendant claims that the trial court abused its discretion and misled the jury by giving a falsus in uno instruction.[9] Specifically, the defendant argues that, because falsus in uno instructions are not mandatory in Connecticut and other courts have advised against them, the court erred in giving such an instruction. The state argues that giving the instruction was squarely within the court's discretion and did not mislead the jury. We agree with the state.

We begin by setting forth the standard of review relevant to this claim. "Our review of [a jury instruction] claim requires that we examine the [trial] court's entire charge to determine whether it is reasonably [probable] that the jury could have been misled . . . . While a request to charge that is relevant to the issues in a case and that accurately states the applicable law must be honored, a [trial] court need not tailor its charge to the precise letter of such a request. . . . If a requested charge is in substance given, the [trial] court's failure to give a charge in exact conformance with the words of the request will not constitute a ground for reversal. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper. . . . Additionally, we have noted that [a]n [impropriety] in instructions in a criminal case is reversible . . . when it is shown that it is reasonably possible for [improprieties] of constitutional dimension or reasonably probable for nonconstitutional [improprieties] that the jury [was] misled. . . . A challenge to the validity of jury instructions presents a question of law over which [we exercise] plenary review." (Citations omitted; internal quotation marks omitted.) *State* v. *Daniel W. E.*, 322 Conn. 593, 610, 142 A.3d 265 (2016).

The following additional facts and procedural history are relevant to this claim. The following instruction was included in the court's proposed jury instructions: "If you conclude that a witness has deliberately testified falsely in some respect, you should carefully consider whether you should rely on any of that person's testimony." The defendant objected to the proposed jury instructions twice and requested that the quoted sen-

tence be removed. The defendant argued that this instruction was prejudicial because the case "turn[ed] so tightly on whether [the jury] believe[d] her testimony . . . ." The state argued that the instruction ought to be given in the present case because it believed that the defendant testified falsely about a series of text messages that she exchanged with the victim on December 31, 2011.[10]

The court's final instructions included the sentence to which the defendant had objected. The court qualified this instruction by including the following language in the jury charge: "In deciding whether or not to believe a witness, keep in mind that people sometimes forget things. You need to consider, therefore, whether a contradiction is an innocent lapse of memory or an intentional falsehood, and that may depend on whether it has to do with an important fact or with only a small detail."

"Connecticut recognizes the maxim falsus in uno, falsus in omnibus as a permissive instruction. . . . Instruction on the maxim is a matter resting in the sound discretion of the trial judge. . . . Furthermore, the court has broad discretion regarding the instruction on the falsus in uno, falsus in omnibus maxim." (Citations omitted; footnotes omitted; internal quotation marks omitted.) *Opotzner* v. *Bass*, 63 Conn. App. 555, 563–65, 777 A.2d 718, cert. denied, 257 Conn. 910, 782 A.2d 134 (2001), and cert. denied, 259 Conn. 930, 793 A.2d 1086 (2002); see, e.g., id., 564–65 (concluding that jury was not misled by court's instruction that if it found that witness "gave false testimony . . . you should . . . believe those parts of it which you think in your exercise of judgment and discretion you should believe" [internal quotation marks omitted]). Like the trial court in *Opotzner*, the court in the present case correctly stated the falsus in uno maxim and informed the jury that it could, in its judgment, choose whether to believe a witness. The falsus in uno instruction provided by the court in the present case correctly stated the law and merely advised the members of the jury as to their task of weighing witness credibility.

The defendant cites decisions from other courts, including state courts in Florida, Alabama, and Rhode Island, and two federal circuit courts of appeal, which advise against the use of falsus in uno instructions. These decisions, however, are merely potentially persuasive authority, and the defendant has failed to cite any Connecticut case law that disapproves generally of the use of falsus in uno instructions. Indeed, the charge has been used in Connecticut for many years. See *Raia* v. *Topehius*, 165 Conn. 231, 234, 332 A.2d 93 (1973) ("[t]he maxim falsus in uno, falsus in omnibus in its permissive form has been approved in this state as an instruction to the jury in relation to [its] determination of the credibility of witnesses"); see also *Willametz* v. *Guida-Seibert Dairy Co.*, 157 Conn. 295, 297, 301, 254

A.2d 473 (1968); *Craney* v. *Donovan*, 92 Conn. 236, 246, 102 A. 640 (1917); *Gorman* v. *Fitts*, 80 Conn. 531, 538, 69 A. 357 (1908). We, therefore, are not persuaded that we should overrule such an established practice. Moreover, the defendant has not demonstrated how the instruction misled the jury in the present case. For the foregoing reasons, we conclude that the defendant has failed to show that the instruction misled the jury and, therefore, that the court did not abuse its discretion by giving the falsus in uno instruction.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be . . . ."

[2] Kwok explained that gunshot residue could be transferred by physical contact with someone who had recently shot a gun.

[3] Because we conclude that the admission of the testimony was harmless, we need not address whether the court erred in admitting Manganello's testimony under the state of mind or residual hearsay exceptions.

[4] Specifically, the defendant argues that she was denied a fair trial as guaranteed by "the fifth and fourteenth amendments to the [United States] constitution and article first, § 8, of the Connecticut constitution."

[5] Because we conclude that the prosecutor's comments were not improper, we need not address whether they deprived the defendant of a fair trial.

[6] The instances of alleged prosecutorial impropriety during closing argument are discussed in detail in subsequent sections of this opinion.

[7] The court instructed the jury in relevant part: "There are three parts to this affirmative defense [of extreme emotional disturbance]. The defendant must prove each of these parts by a preponderance of the evidence: one, that the defendant was exposed to an extremely unusual and overwhelming stress that was more than annoyance or unhappiness; two, that the defendant had an extreme emotional reaction to the stress, as a result of which there was a loss of self-control, and reason was overborne by extreme intense feelings, such as passion, anger, distress, grief, excessive agitation or other similar emotions; and three, that from the viewpoint of a reasonable person in the defendant's situation, under all the circumstances as the defendant believed them to be, there was a reasonable explanation or excuse for such extreme emotional disturbance influencing her conduct."

[8] These text messages, which the state used to impeach the defendant, are set forth subsequently. See footnote 10 of this opinion.

[9] "The prerogative of the fact finder to discredit the entire testimony of a witness if it determines that the witness intentionally has testified falsely in some respect is referred to by the Latin maxim falsus in uno, falsus in omnibus." *State* v. *Caracoglia*, 134 Conn. App. 175, 191, 38 A.3d 226 (2012). The maxim literally means "false in one, false in all." Id., 191 n.4.

[10] The defendant testified that the following text messages referred to UGG boots: "[The Defendant]: Please call about product. . . .

"[The Defendant]: Can you get what we talked about?

"[The Victim]: How much . . . .

"[The Defendant]: [Two] 8's."

Keith Graham, a sergeant with the Connecticut Statewide Narcotics Bureau, testified, however, that based on his training and experience, "two 8s" refers to "8 balls" of cocaine, or about seven grams of the drug.