******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

STATE OF CONNECTICUT *v.* ALANNA R. CAREY
(SC 20273)

Robinson, C. J., and McDonald, D'Auria,
Mullins, Kahn, and Ecker, Js.

*Syllabus*

Convicted of the crime of murder in connection with the shooting death of the victim, the defendant appealed. The defendant and the victim were in a relationship, which had deteriorated in the weeks preceding the victim's death. On the day of the shooting, the defendant drove to a motel at which the victim had been staying and, several hours later, shot the victim in his motel room. At trial, the defendant asserted a theory of self-defense, claiming that she and the victim had argued in the motel room, that the victim had a knife, and that she feared for her life and had no time to flee. The state called a witness, M, during its case on rebuttal in an attempt to show that the victim had been afraid of the defendant. Over defense counsel's objection, M testified that, a few weeks before the victim's death, he told M that he had crawled into the defendant's home through a window to retrieve some personal possessions, that the defendant put a gun to his head and threatened him, and that her threats frightened him. On appeal, the Appellate Court affirmed the judgment of conviction, concluding, inter alia, that, even if the trial court had improperly admitted M's testimony, its admission was harmless in light of the overwhelming evidence of the defendant's consciousness of guilt. Thereafter, the defendant, on the granting of certification, appealed to this court. *Held* that the Appellate Court correctly concluded that any error relating to the admission of M's testimony was harmless, as the defendant failed to satisfy her burden of demonstrating that M's testimony substantially affected the jury's verdict: the incident that M recounted to the jury in her testimony was not the primary, or even a significant, basis for the case against the defendant, as the state introduced physical evidence that was inconsistent with the defendant's account of the shooting, evidence undercutting the defendant's claim that the victim had been the aggressor in their relationship, evidence of the defendant's conduct before the shooting that demonstrated her intent to use her gun, and evidence of the defendant's conduct after the shooting that demonstrated her consciousness of guilt; moreover, there was testimony from other witnesses that the defendant had previously displayed aggression toward the victim and that he was fearful of the defendant, and certain aspects of M's testimony supported the defendant's primary theory of the case.

Argued June 3—officially released November 23, 2020*

*Procedural History*

Substitute information charging the defendant with the crime of murder, brought to the Superior Court in the judicial district of New Britain and tried to the jury before *Keegan, J.*; thereafter, the court, *Keegan, J.*, denied in part the defendant's motion to preclude certain evidence and denied the defendant's motion for a mistrial; subsequently, verdict and judgment of guilty, from which the defendant appealed to this court; thereafter, the case was transferred to the Appellate Court, *Alvord, Sheldon* and *Eveleigh, Js.*, which affirmed the trial court's judgment, and the defendant, on the granting of certification, appealed to this court. *Affirmed.*

*Jennifer B. Smith*, for the appellant (defendant).

*Rocco A. Chiarenza*, assistant state's attorney, with whom, on the brief, were *Brian Preleski*, state's attor-

ney, *John H. Malone*, former supervisory assistant state's attorney, and *David Clifton*, assistant state's attorney, for the appellee (state).

*Opinion*

KAHN, J. The defendant, Alanna R. Carey, appeals from the judgment of the Appellate Court affirming the trial court's judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a (a). On appeal, the defendant claims that the Appellate Court incorrectly concluded that any error relating to the admission of testimony from a witness called during the state's case on rebuttal, Mark Manganello, was harmless. Specifically, the defendant claims that Manganello's testimony fatally undermined her theory of self-defense and that, as a result, it likely had a substantial effect on the jury's verdict. We disagree and, accordingly, affirm the judgment of the Appellate Court.

The jury could have reasonably found the following facts. The defendant began dating the victim in 1999. In 2008, the victim and his children from a previous marriage began living at the defendant's home in Glastonbury. The relationship between the defendant and the victim was deeply troubled; they often fought, called each other names, and exchanged threats of violence. The two were once engaged but never married. Although the defendant testified that the victim often became agitated, and even physically abusive, their neighbors also testified that the defendant appeared to be the aggressor during arguments and that the victim "most often" would just leave the house when those fights occurred.

The jury heard various pieces of evidence about the victim's activities and character. He was a member of the James Gang Motorcycle Club, carried multiple knives, used cocaine, drank to excess, and often stayed out late.[1] Testimony offered at trial indicated that the victim wore a "1 percenter" patch on his leather club vest, which signified that he was part of the 1 percent of motorcycle riders who do not obey the law. The defendant sought to show her own subjective fear of the victim by calling a particular witness, David Hillman, who testified that the victim had threatened him at a bar in South Glastonbury, that several men had physically assaulted him, and that the victim had injured him twice with a knife. Other testimony presented to the jury, however, indicated that the James Gang Motorcycle Club included individuals with "regular every day jobs" and that, although the police had some suspicions about their activities, it never led to any arrests.

The relationship between the defendant and the victim deteriorated over the weeks preceding the victim's death. On December 12, 2011, the defendant's sister, Johanna Carey-Lang, discovered the victim with another woman, Jodi D'Onofrio, inside of the defendant's own home. This discovery led the victim to call the defendant and admit his infidelity.[2] This incident did not, however, immediately end their relationship;

later that same day, the defendant was cuddling with the victim on the couch and asked Carey-Lang to leave so that they could spend time together.[3] Two days later, the victim moved out of the home, gave his keys to the defendant, and rented room 145 at the Carrier Motor Lodge (motel) in Newington, the location where the victim later died. At one point, the defendant described this separation to the jury as "a timeout for repeated bad behavior . . . ."

Approximately two weeks prior to the victim's death, there was an incident between the defendant and the victim at the same motel. On December 18, 2011, the defendant brought her gun, but not her cell phone, to the motel, checked into a room, and then called Carey-Lang using the telephone inside of that room in order to ask her to place a three-way call to the victim.[4] The victim answered that call from his own room and, during the course of that conversation, told the defendant that he loved D'Onofrio. D'Onofrio, who was lying in bed with the victim at the time, looked out of the window and saw the defendant's car parked outside. The defendant left a short time later, and the victim then escorted D'Onofrio to her car. The defendant testified that she returned to the motel later that same evening, had sex with the victim, and checked out of her own room the following morning. One of the victim's friends, Jessica Montano, testified that the victim had told her that he was scared by the defendant's actions that day. Specifically, Montano testified that the victim had described the defendant as "more upset than he had ever seen her" and indicated that the defendant "would do anything to get him to stay."

Manganello's testimony, the admission of which is the subject of the present appeal, relates to the victim's out-of-court description of an altercation that allegedly occurred on December 24, 2011. That testimony, which will be reviewed in greater detail subsequently in this opinion, indicated that the victim had entered the defendant's home through a window to retrieve some belongings on that date and was confronted by the defendant, who allegedly pointed a gun at his head, told him to get out, and threatened to "blow his f'ing brains out" if he ever returned.

Notwithstanding these events, the defendant and the victim continued to interact with one another over the days that followed. On a few occasions, the defendant asked Carey-Lang to leave the home in Glastonbury so that she could spend "alone time" with the victim. The defendant testified, more specifically, that she had sex with the victim on at least three occasions from December 25, 2011, to January 1, 2012.[5] The defendant also recounted various other interactions with the victim during this time relating to his children, laundry, and diabetes.[6]

By January, the defendant believed their relationship

was ending. On January 1, 2012, the defendant sent a text message to a friend, stating, "I think he is afraid to have to explain to his friends if he were to come back home. I think that this split is permanent. I asked about therapy, he said it used to be an option. I don't think it is an option any more." The following morning, the defendant asked to accompany Carey-Lang and her boyfriend, Leon Brazalovich, to an indoor shooting range located inside of Hoffman's gun store in Newington. Although Carey-Lang testified that she had planned the trip for Brazalovich's entertainment, only the defendant and Carey-Lang brought their guns and signed into the range that day.[7] The range safety officer, Steven Wawruck, testified that both of the sisters appeared to be amateurs and that both required assistance when their guns jammed. Wawruck also recalled that the defendant did most of the shooting that day.

Shortly after leaving the shooting range, the defendant spoke with the victim over the phone. The defendant testified that the victim had asked her to bring him lunch because he had run out of money and needed food to regulate his insulin levels. The defendant then drove Carey-Lang and Brazalovich to a nearby restaurant and, along the way, asked Brazalovich to reload the magazines to her gun. When Brazalovich finished, he placed the loaded magazines inside of a zippered case containing the defendant's gun. The defendant then drove to the motel and exited the vehicle with a bag of food, her purse, and that zippered case. Brazalovich and Carey-Lang then took the vehicle and left to go get their own lunch shortly after 2 p.m. It is undisputed that the defendant shot the victim three times around 7:30 p.m. that evening in his motel room and that, as a result, the victim died.

The defendant provided the jury with her own account of the events inside of the victim's motel room that led to his death. She testified that, after lunch on the day of the shooting, the victim began blaming Carey-Lang for catching him with D'Onofrio and became very angry that Carey-Lang and Brazalovich had just been in the motel parking lot.[8] The defendant stated that she eventually succeeded in calming the victim down and that she went into the bathroom with her purse around 3:15 p.m.[9] The defendant testified that, at that time, she took her gun out of her purse, put a magazine into it, chambered a round, and then returned the gun to her purse.[10]

The defendant stated that the conversations with the victim were "up and down" after that. According to the defendant, the victim told her that he wanted to move back in with her, but she told him that it would not be possible without counseling. The defendant stated that this caused the victim's anger to "flare up" again.[11] Starting around 4:20 p.m., the defendant began sending a series of text messages to Carey-Lang asking when she

could be picked up. These messages stated, among other things, that the victim was mad, yelling at her, and making threats.[12] Carey-Lang, who had been at a gymnastics class with her daughter, eventually left to pick up the defendant around 6:50 p.m. The defendant testified that, around that time, she had succeeded in calming the victim down a second time and had then, once again, excused herself to use the bathroom. The defendant stated that, while she was out of the room, the victim received a call from D'Onofrio and that, when she returned, the victim was "agitated" and "looking to pick a fight . . . ." The defendant told the jury that a loud argument ensued[13] and that she eventually succeeded in calming the victim down for a third time.

The defendant testified that, at this point, the victim was reclined against the headboard of one of the beds with his left leg bent up near his body and his right leg dangling off the side. The defendant indicated that she sat on the same side of the same bed, "practically touching knee to knee" with the victim. The defendant then exchanged another series of text messages with Carey-Lang who, at the time, was waiting in a vehicle with her daughter in the parking lot of a nearby grocery store. The defendant testified that she texted Carey-Lang, "[I'm] [c]oming" at 7:22 p.m., put her phone back inside of her purse, and that everything then "just hit the fan."

The defendant stated that she told the victim that she knew one of his children had recently moved into D'Onofrio's home, and that the victim responded by becoming intensely angry and calling her a "sneaky f'ing cunt." The defendant testified that she then told the victim that she had "met somebody else" and that she "felt it was best" that he pursue his relationship with D'Onofrio. According to the defendant, the victim then said that she would not be leaving him, that "he had already put a hit out on [her] family through his club brothers," and that he "would be taking [her] out personally." The defendant stated that the victim already had a fixed blade knife with a wooden handle in his left hand and that he used his other hand to reach for a second knife located on a nightstand to his right. The defendant testified that she then pulled the gun from her purse, backed up past the end of the bed, pleaded with the victim to let her go, and, moments later, shot him three times. The defendant testified that the victim was going to attack her, that she feared for her life, and that she had no time to flee.

After shooting the victim, the defendant remained in the room, called Carey-Lang, and asked her to come inside without her daughter.[14] The defendant testified that she moved the knife away from the victim's hand and that, once Carey-Lang arrived, they discovered that the victim no longer had a pulse. Carey-Lang then began yelling at the defendant and told her to call 911. The

defendant testified that, at that point in time, she felt compelled to leave the room because of her continued fear of the victim. When she left the room, however, the defendant took her phone, her purse, her gun, the shell casings from the floor, the bag that had previously contained their lunch, and a key to the room.[15]

The defendant and Carey-Lang then drove to a house owned by their brother, Joseph Carey, in the nearby town of Wethersfield. Joseph Carey also told the defendant that she needed to go back to the motel and to call 911, and advised her to place everything "back exactly the way it was" in the room.[16] Although the defendant initially agreed to return to the motel during the conversations that followed, Carey-Lang testified that she eventually had to push the defendant out of the car when they approached the motel. The defendant admitted that she went back into the room, placed the knife under the victim's hand, put the bullet casings back on the floor, and set down her gun. She then called 911 shortly after 10 p.m.

During that call, the defendant stated the following: "My boyfriend and I were, you know, talking and all of a sudden he got real angry, he came at me with a knife, and I was scared, I shot him." Although the defendant never expressly told the 911 dispatcher when the shooting had occurred, some of her language was discordant with the reality that nearly three hours had, in fact, passed since the victim's death. Specifically, the defendant told the dispatcher that she did not know whether the victim was still moving or whether she had been injured. After the police arrived and arrested the defendant, she became nonresponsive and was transported to a nearby hospital for evaluation.[17]

Several pieces of physical evidence relating to the crime scene are particularly noteworthy. The victim was found lying on his right side with his head in between the nightstand and the bed. An autopsy revealed that three bullets had entered his upper body, one of which had damaged his heart. Although the medical examiner was unable to determine the relative positions of the defendant and the victim from the nature of these wounds, a former deputy director of the state forensic science laboratory, Robert O'Brien, testified that the absence of gunpowder from the victim's shirt indicated that the muzzle of the defendant's gun was greater than three feet away from the victim at the time of the shooting. The defendant's use-of-force expert, Massad Ayoob, estimated that the victim was initially positioned six feet, seven inches away from the location near the foot of the bed where the defendant had discharged her weapon. Ayoob's research indicated that an individual armed with a knife, sitting in the same position as the victim on the bed, could close that distance and inflict injuries in less than a second and that it would have taken a person in the defendant's position

a comparatively greater amount of time to escape. Photographs taken by the police show a large, sheathed knife atop the nightstand near an upright beer bottle. Finally, a detective from the Newington Police Department, Leroy Feeney, testified that the front pocket of the defendant's purse contained a pair of clear, disposable gloves.[18]

The jury deliberated for four days. During that time, the jury asked for the court to play back the defendant's testimony related to the day of the shooting and, more specifically, her account of the events that occurred inside of the motel room. No other testimony was requested. On October 7, 2015, the jury returned a verdict finding the defendant guilty of the crime of murder. The trial court subsequently rendered a judgment of conviction in accordance with that verdict and sentenced the defendant to fifty years of incarceration.

The defendant then appealed, claiming, inter alia, that the trial court improperly had admitted Manganello's testimony.[19] In that appeal before the Appellate Court, the state conceded that the trial court had erred by admitting that testimony under the state of mind exception to the hearsay rule. The state argued, instead, that Manganello's testimony could have been admitted under the residual exception to the hearsay rule and, in the alternative, that any error was harmless. The Appellate Court agreed with the state's latter argument and held that, even if the trial court had erred in admitting Manganello's testimony, that error would have been harmless "in light of the overwhelming evidence of the defendant's consciousness of guilt." *State* v. *Carey*, 187 Conn. App. 438, 450, 202 A.3d 1067 (2019). The Appellate Court focused its analysis of this issue exclusively on events that occurred after the shooting, including the defendant's initial refusal to call the police, her flight from the scene with various pieces of physical evidence, her reluctance to return, and the misleading nature of her statements to the 911 dispatcher. Id., 449–51. The Appellate Court rejected the defendant's remaining claims and, accordingly, affirmed the trial court's judgment of conviction. Id., 466. This appeal followed.[20]

Like the Appellate Court, we assume, without deciding, that the trial court's evidentiary ruling pertaining to Manganello's testimony was in error and focus our analysis on the question of whether the defendant was harmed by its admission.[21] The defendant argues that the incident on December 24, 2011, carried unique force and was crucial to the state's theory of the case, particularly because the state's overall case against her was weak. In response, the state argues, among other things, that it had a strong case against the defendant and that Manganello's testimony was cumulative in several respects. For the reasons that follow, we are unable to conclude that the defendant has satisfied her burden of demonstrating that the challenged testimony sub-

stantially affected the jury's verdict and, accordingly, affirm the judgment of the Appellate Court.

The following additional facts are necessary to place Manganello's testimony into context with the other evidence presented at trial. The state called Manganello during its case on rebuttal in an attempt to show that the victim had been afraid of the defendant. The state proffered a sworn statement from Manganello indicating that the victim had told him about a particular confrontation during which the defendant had allegedly drawn a gun. The purpose of his testimony, the state argued, was to show that the victim had "a healthy fear" of the defendant and her gun and, therefore, that it was unlikely that he would have chosen to attack her with a knife.

The defendant had filed a motion in limine seeking to suppress parts of Manganello's testimony. At trial, although defense counsel conceded that Manganello permissibly could have testified that the victim was generally afraid of the defendant, he objected to any testimony relating to the victim's account of the specific events giving rise to that fear. The state argued in response that the proffered testimony was relevant to show motive, intent, and the absence of an accident. The state also argued that Manganello's testimony showed the victim's state of mind on the date of his death and that, in any event, his testimony would be admissible under the residual exception to the rule against hearsay. The trial court agreed with the state and concluded that Manganello's testimony was both relevant and admissible under the state of mind exception to the hearsay rule.

Manganello testified at trial that, on December 27, 2011, the victim told him that he had crawled into the defendant's home through a window to retrieve some personal possessions on December 24, 2011. Manganello stated that the victim did not know that the defendant was home and that, according to the victim's account, she had "put a gun to his head and . . . told him to get the F out of here and if he ever came back, she would blow his f'ing brains out." Manganello testified that, on December 31, 2011, the victim once again stated, "can you believe that bitch said she'd blow my f'ing brains out?" Manganello then testified, generally, that the defendant's threat frightened the victim. On cross-examination, defense counsel attempted to discredit Manganello's testimony by emphasizing the fact that he did not personally witness the confrontation recounted by the victim and by drawing the jury's attention to a series of benign text messages[22] exchanged between the defendant and the victim shortly after the alleged confrontation would have occurred.[23]

In closing, the state pointed to several pieces of evidence in an attempt to demonstrate that the defendant possessed an intent to kill the victim on January 2,

2012. The state argued, among other things, that (1) the defendant's trip to the shooting range[24] and her possession of disposable gloves[25] showed preparation, (2) the shooting did not occur until Carey-Lang was outside waiting for her, (3) the defendant had moved the knife and fled the scene, (4) the absence of gunshot residue on the victim's shirt showed that he was not within three feet of the defendant at the time of the shooting, (5) the defendant's 911 call made it sound as if the shooting had just happened, (6) the defendant had the presence of mind to take her personal belongings, the food bag, and the shell casings with her when she left, and (7) the defendant had staged the scene before calling 911. The state then argued that the defendant had concocted a "story" of self-defense because the victim's call with D'Onofrio could have connected her to the room and a .380 caliber gun was registered in her name.[26] The state argued that the text messages exchanged between the victim and D'Onofrio on the day of the shooting; see footnotes 9 and 11 of this opinion; were inconsistent with the defendant's testimony that the call that the victim received shortly before 7 p.m. had enraged him. Finally, the state asked the jury to infer that the defendant had asked Carey-Lang to place a three way call to the victim on December 18, 2011, so that he would not know that she was at the motel.

The state's most direct response to the defendant's theory of self-defense was derived from the location of the various pieces of physical evidence discovered at the crime scene. The following passage from the state's closing argument reflects the importance of this evidence to the state's theory of the case: "[The defendant] says she doesn't move until [the victim] makes that threat and moves. . . . [H]e's pivoting to get this knife and he's lunging toward her and that causes her to move. . . . [S]he's able to stand up. . . . She's able to back up six feet. . . . She's pleading for her life . . . . She draws her gun. . . . She aims at his torso . . . and she fires. . . . We know that [knife on the nightstand] never got taken, right? He never touched it. It's still in its sheath. . . . It's not on the ground with him. . . . She's able to get up, stumble back, get over six feet away . . . draw, aim and fire before his hand can touch that knife right next to him. Does that make any sense? Now let's look at the body position. . . . [The victim's] between the bed and the nightstand. If he is standing and lunging like the defendant claims, she shoots him, why isn't he facedown between the bed and her? . . . You heard . . . Ayoob testify that [someone in the victim's] position could get to someone in the defendant's position in under a second . . . . [The] timing does not match."

The state's closing argument contains, by contrast, only passing references to the substance of Manganello's testimony. The defendant has drawn our atten-

tion to only a few instances in which the state argued, summarily, that the incident on December 24, 2011, was credible evidence of the defendant's intent. For example, toward the end of his rebuttal argument, the prosecutor stated: "Maybe [the victim] didn't pick it up, maybe he dismissed it too soon, but . . . when she said if you ever come around here I'm going to blow your head off, he should have been tipped off. That's what her intent was. She brought the gun in there to finish this off the way she wanted."[27]

The defendant concedes that the claim raised in the present appeal is evidentiary, rather than constitutional, in nature. The standard of review applicable to such a claim is well established. "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [W]hether [an improper ruling] is harmless in a particular case depends upon a number of factors, such as the importance of the . . . testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the . . . evidence on the trier of fact and the result of the trial. . . . [T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error." (Internal quotation marks omitted.) *State* v. *Ayala*, 333 Conn. 225, 231–32, 215 A.3d 116 (2019); see also, e.g., *State* v. *Jackson*, 334 Conn. 793, 818, 224 A.3d 886 (2020).

The state presented four categories of evidence in support of its case and in response to the defendant's theory of self-defense, all of which were largely unrelated to Manganello's testimony. First, the state introduced physical evidence that was inconsistent with the defendant's account of the shooting. Second, the state introduced evidence undercutting the defendant's claim that the victim had been the aggressor in their relationship and that she had decided to leave him. Third, the state relied on the defendant's conduct before the shooting as evidence of her intent to use her gun. Finally, the state argued that the defendant's conduct after the shooting demonstrated consciousness of guilt. A review of these points illustrates the strength of the state's case.

The physical evidence at the scene was inconsistent with the defendant's description of the events preceding the shooting. The defendant testified that she had been sitting on the same side of the same bed as the victim and that he was already armed with a fixed blade knife at the time he started to attack her. The defendant stated that the victim reached for a second knife on the nightstand with his other hand while simultaneously

lunging toward her. The physical evidence discovered at the scene, however, suggested that the victim succeeded in doing neither. The victim's body was discovered near the head of the bed where he had been sitting, not near the end of the bed where the defendant had been standing. The absence of gunshot residue on the victim's shirt likewise indicates that the barrel of the defendant's gun was greater than three feet away from the victim at the time of the shooting. Although the victim had been sitting right next to the nightstand, the sheathed knife he had allegedly reached for remained resting there alongside an upright bottle of beer.[28]

Various witnesses other than Manganello testified that the defendant had acted aggressively toward the victim in the past. The defendant's neighbors testified that she appeared to be the aggressor during their arguments and would often yell loudly. They indicated that the victim, on the other hand, would "most often" just leave the house. Likewise, both Montano and D'Onofrio testified that the victim was scared by the defendant's decision to rent her own room at the motel on the day of the prior incident of December 18, 2011. The record also contained evidence to support the conclusion that the victim, and not the defendant, had sought to end the relationship. Carey-Lang testified that, even though the victim was caught cheating, the defendant "just accepted it and loved him and wanted to be with him." See footnote 3 of this opinion. D'Onofrio testified that, on December 18, 2011, the victim told the defendant directly that he loved D'Onofrio. Lastly, both the defendant's description of their separation as a "timeout for bad behavior" and the text message that she sent to her friend on January 1, 2012, indicated that, contrary to her testimony, it was the defendant that wanted to continue their relationship.

The defendant's conduct before the shooting also provided circumstantial evidence relevant to her intent. First, the defendant went to a shooting range that day to practice using her gun and asked someone else to load ammunition into the empty magazine after she was done. Second, the front pocket of the defendant's purse contained a pair of disposable gloves. Third, during the middle of her visit with the victim, the defendant took her gun to the bathroom, loaded a full magazine into it, and chambered a round of ammunition. At the same time, the victim was sending a text message to D'Onofrio professing his continued love.

As the Appellate Court's decision noted, the defendant's actions after the shooting provided yet further evidence from which the jury could have inferred the defendant's guilt. See *State* v. *Carey*, supra, 186 Conn. App. 450. Although the defendant testified that she fled the room that evening in a state of abject fear, notwithstanding the fact that the victim no longer had a pulse, she initially chose to remain inside until her sister

arrived and then took pains to gather various items from around the room before she left. These items included her purse, the gun, the shell casings from the floor, the bag of food that she brought with her, and a key to the door that she subsequently locked behind her. The defendant also admitted to manipulating the single piece of physical evidence that would have shown the victim had acted in aggression—the knife—not once, but twice. Finally, when she eventually called 911, she chose not to tell the dispatcher that the shooting had, in fact, occurred hours before. Apart from Manganello's testimony, the jury had ample evidence from which it could have determined the defendant's guilt.

In light of this broad range of evidence, we cannot conclude that Manganello's testimony was either crucial to the state's theory of intent or that its overall case against the defendant was particularly weak. The incident recounted to the jury through Manganello's testimony was not the primary, or even a significant, basis for the case against the defendant. The state's closing argument referenced it on a few, brief occasions, and it was not an important point of emphasis. Moreover, although the jury's deliberations took four days, its members sent a note to the court stating that "[w]e are only concerned with the parts of the defendant's testimony [that] directly pertain to what happened in the room." Cf. *State* v. *Moody*, 214 Conn. 616, 629, 573 A.2d 716 (1990) ("a jury's request that testimony be reread indicated that the jury regarded the evidence as important").

We agree with the defendant that the substance of Manganello's testimony was not corroborated by other witnesses and that it was "unique" in that sense, but there was nothing unique about the underlying point of the testimony—the defendant had displayed aggression toward the victim in the past, and he was fearful of her. The defendant herself testified that she had previously threatened the victim with physical violence. As stated previously in this opinion, Montano testified that the victim was generally afraid of the defendant. This evidence was echoed by D'Onofrio, who informed the jury that the victim had specifically expressed fears that the defendant was going to kill him over the weeks preceding his death. Testimony at trial also indicated that the victim knew that the defendant owned a gun and that she would have been carrying it with her for protection. Nor was the incident described by Manganello the only evidence that the jury heard about the defendant's access to a gun. The jury heard that a mere two weeks prior to the shooting, the defendant had taken a gun to, and booked a room at, the same motel where the shooting occurred.

Finally, we note that certain aspects of the incident described by Manganello actually supported the defen-

dant's primary theory of the case. The defendant spent a significant amount of time at trial attempting to demonstrate that the victim was a member of an "outlaw motorcycle gang" and that, as a "1 percenter" patch holder, he was not generally concerned with obeying the law. Manganello's testimony demonstrated, by the victim's own words, that he was an individual who was willing to break into someone's home. Manganello's testimony cast the victim as a lawbreaker and the defendant as the target of that unlawful conduct. We note, in particular, that the defendant would have been legally justified to draw her gun in response to such an intrusion. See General Statutes § 53a-20. Put differently, this is not a case in which the trial court admitted hearsay evidence that the defendant had previously engaged in unprovoked, gratuitous violence,[29] or that she was prone to threatening others with her gun in the absence of just cause. The specific incident at issue in this appeal would tend to support the defendant's position that she had good reason to be fearful of the victim. Manganello's testimony showed the jury little more than what the defendant herself asserted: that she was willing to draw her gun on the victim in an act of self-defense. As such, the challenged testimony was consistent in certain important respects with the defendant's own theory of the case.

In order to prevail on the evidentiary claim before us, the defendant bears the burden of demonstrating that Manganello's testimony substantially swayed the jury's verdict. For the reasons explained, we are simply unable to conclude that she has satisfied that burden. We therefore agree with the Appellate Court's assessment that any evidentiary error committed by the trial court with respect to the admission of that testimony was necessarily harmless.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

* November 23, 2020, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] Documents and testimony offered during the course of trial indicate that the defendant began, but subsequently abandoned, efforts to evict the victim from her home in both 2009 and the spring of 2011.

[2] According to the defendant, the victim had cheated on her with at least four other women during the course of their relationship.

[3] Carey-Lang testified that this conduct troubled her: "I was disappointed in seeing her with [the victim] cuddling and acting like nothing ever happened. That he was, you know, he was cheating on her and she just accepted it and loved him and wanted to be with him."

[4] As a result of this fact, the victim's cell phone showed that the call was coming from the defendant's home.

[5] At 1:47 a.m. on December 31, 2011, the defendant sent a text message to the victim stating, "[s]o sorry. [You] work it fantastically. Please call about product." The following afternoon, the victim replied, "[s]orry about my attitude last [night] . . . ." The defendant then replied, "[i]t's ok. Thank you for apologizing. Can you get what we talked about?" The victim responded, "[h]ow much." The defendant then replied, "2 8s." At trial, the defendant explicitly testified that she had been referring to two size eight boots. This testimony was, however, undercut by the fact that the defendant, on cross-examination by the state the following day, admitted to using cocaine with the victim on January 1, 2012. See footnote 17 of this opinion.

[6] Testimony offered at trial indicated that the victim was a type 2 diabetic.

[7] Carey-Lang and the defendant had previously discussed the possibility of such an outing after visiting the store in search of a paintball gun for Brazalovich's nephew. Testimony offered at trial indicated that the defendant was not a frequent visitor to the shooting range.

[8] At 2:46 p.m., Carey-Lang sent a text message to the defendant stating that she was done with lunch. The defendant responded that she needed another hour with the victim. Carey-Lang told the defendant to call when she was done.

[9] At 3:17 p.m., the victim sent a text message to D'Onofrio, stating "I love the pictures of us you are beautiful and every time I think I couldn't possibly be more in love with you I see you and realize I love [you] more . . . ."

[10] The defendant told the jury that it was her habit to carry her gun with a bullet in the chamber so that she could defend herself quickly in the event of an attack.

[11] At 4:05 p.m., the victim received the following text message from D'Onofrio: "My Monday nights are far more entertaining when you're here with me. Miss you baby."

[12] Specifically, the defendant testified that the victim had said, "I'd like to knock your teeth out" and other things "along those lines . . . ."

[13] An individual who had been staying in the room next door; see footnote 15 of this opinion; testified at trial that he heard gunshots between 7:16 and 7:38 p.m., but that he did not hear anything else from the room that day. A substantial amount of evidence was adduced by both the state and the defendant in an attempt to show whether arguments such as those described by the defendant would have been heard through the motel room walls. The jury was, of course, free to weigh that evidence as it saw fit and reach its own conclusions. See, e.g., *State* v. *Meehan*, 260 Conn. 372, 381, 796 A.2d 1191 (2002) ("[i]t is axiomatic that evidentiary inconsistencies are for the jury to resolve, and it is within the province of the jury to believe all or only part of a witness' testimony").

[14] Although the defendant testified that she wanted to seek medical attention for the victim, she did not do so.

[15] An individual staying in the room next door; see footnote 13 of this opinion; testified that he had been outside at the time and that he saw the defendant make sure that the door to room 145 was locked before leaving with Carey-Lang.

[16] At trial, Joseph Carey testified that this particular remark was prompted by the bag of food that the defendant had taken from the motel. That bag, however, was not with the defendant when she was arrested. Joseph Carey speculated that it "might have ended up in the back of [his] truck."

[17] A physician, Hamid Ehsani, subsequently diagnosed the defendant with "conversion disorder," which he described as "a change in the neurologic status of a patient which cannot be explained easily by any obvious medical condition." Ehsani indicated, however, that he could not rule out "malingering," which he described as "when one acts in a certain way . . . for secondary gain . . . because it suits their purposes at the time." A toxicologist, Mitchell Sauerhoff, testified that, although the defendant tested positive for cocaine, he was unable to determine precisely how much of that drug the defendant had used, when she had taken it, or whether she had been under the influence of that drug at the time of the shooting. See footnote 5 of this opinion. Although the defendant admitted to using cocaine with the defendant in the motel room the day before the shooting, she denied using any cocaine the following day.

[18] The defendant's DNA was found only on the exterior of those gloves. The defendant testified that she carried them to pump gas. Carey-Lang testified that the defendant used such gloves mostly for cleaning.

[19] The defendant initially appealed to this court, and we then transferred that appeal to the Appellate Court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[20] We granted the defendant's petition for certification to appeal, limited to the following issue: "Did the Appellate Court correctly conclude that the allegedly improper admission of . . . Manganello's hearsay testimony was harmless?" *State* v. *Carey*, 331 Conn. 913, 203 A.3d 1246 (2019).

[21] In its brief to this court, the state argues that Manganello's testimony was admissible under (1) the residual exception set forth in § 8-9 of the Connecticut Code of Evidence, and (2) the state of mind exception set forth in § 8-3 (4) of the Connecticut Code of Evidence. The defendant, in reply, posits that the state is procedurally barred from arguing the former for various reasons and, in the alternative, that both of those claims fail on

their merits. Because we agree with the Appellate Court's conclusion that any error in relating to the admission of the challenged testimony was harmless, we need not address these arguments. See, e.g., *State* v. *Jamison*, 320 Conn. 589, 595, 134 A.3d 560 (2016).

[22] Those text messages, which related to the exchange of a fruit basket, were sent between 1:08 and 1:21 a.m. on December 25, 2011.

[23] The transcript of Manganello testimony spans thirteen pages. The presentation of evidence in this case, by comparison, took more than three weeks.

[24] The state argued that, because Brazalovich did not bring his gun that day, it would be reasonable to infer that the trip was not planned for his entertainment.

[25] The state highlighted the fact that the defendant and Carey-Lang explained these gloves in a slightly different manner. See footnote 18 of this opinion.

[26] The state buttressed this argument by positing, generally, that the defendant lacked credibility. The state suggested that the defendant seemed rehearsed and confrontational. It then reminded the jury that the defendant had explained that her request for "2 8s" of "product" was a reference to size eight boots. See footnote 5 of this opinion. The state also noted several inconsistencies and ambiguities in the record relating to, among other things, whether the defendant's eyes were closed during the shooting, how long she remained at the gun range that morning, and whether she asked Carey-Lang to leave her home on December 12, 2011.

[27] At the state's request, the trial court included the following instruction relating to Manganello's testimony in its final charge to the jury: "The state has offered evidence of an act of misconduct of the defendant. This is not being admitted to prove the bad character, propensity or criminal tendencies of the defendant. Such evidence is being admitted solely to show or establish the defendant's intent, malice on the part of the defendant against the decedent, a motive for the commission of the crime alleged, absence of mistake or accident on the part of the defendant. You may not consider such evidence as establishing a predisposition on the part of the defendant to commit the crime charged or to demonstrate a criminal propensity.

"You may consider such evidence if you believe it and further find that it logically, rationally and conclusively supports the issues for which it is being offered by the state, but only as it may bear on the issues delineated herein. On the other hand, if you do not believe such evidence, or even if you do, if you find that it does not logically, rationally and conclusively support the issues for which it is being offered by the state, as previously delineated, then you may not consider that testimony for any purpose.

"You may not consider evidence of other misconduct of the defendant for any purpose other than the ones I've just told you, because it may predispose your mind uncritically to believe that the defendant may be guilty of the offense here charged merely because of the alleged other misconduct. For this reason, you may consider the evidence only on the issues as delineated and for no other purpose."

[28] In light of this physical evidence, we cannot agree with the defendant's assertion that there was "no evidence that contradicted her testimony," or that the present case was entirely based on her credibility as a witness. Cf. *State* v. *Favoccia*, 306 Conn. 770, 809, 51 A.3d 1002 (2012).

[29] Even if we were to agree with the defendant that Manganello's testimony could have painted her as a "hot tempered" or "violent" individual, the trial court explicitly instructed the jury that it could not use that evidence to "[establish] a predisposition on the part of the defendant to commit the crime charged or to demonstrate a criminal propensity." See footnote 27 of this opinion. In the absence of any indication to the contrary, we assume that the jury followed that instruction. See, e.g., *State* v. *Ramos*, 261 Conn. 156, 167, 801 A.2d 788 (2002), overruled in part on other grounds by *State* v. *Elson*, 311 Conn. 726, 91 A.3d 862 (2014).